UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**HAILEY DOUGLAS**

and

**MORGAN JOHNSON**

Plaintiffs,

v.

**RH CHERRY CREEK, LLC d/b/a SONIC DRIVE-IN**

Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs, Hailey Douglas ("Douglas") and Morgan Johnson ("Johnson") (together "Plaintiffs"), by and through their attorneys, HKM Employment Attorneys, LLP, hereby file their Complaint against Defendant, RH Cherry Creek, LLC d/b/a Sonic Drive-In ("Sonic" or "Defendant"), and in support thereof state as follows:

### PRELIMINARY STATEMENT

1.      Plaintiffs bring this action for damages as a result of Defendant's discrimination against them on the basis of their sex and/or race.  In retaliation for reporting the same, Defendant adversely altered the terms and conditions of Plaintiffs' employment and terminated Plaintiffs. Plaintiffs bring claims against Defendant pursuant to Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. §§ 2000e, et seq. ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); and the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401, *et seq.* ("CADA").

## PARTIES

2.      Ms. Douglas is an individual who is a resident and domiciliary of Colorado.  At all times relevant to this Complaint, Douglas is and was a member of a protected class of individuals recognized under 42 U.S.C. § 2000e-2(a)(1), which prohibits discrimination based on race and/or sex (African American, female).

3.      Ms. Johnson is an individual who is a resident and domiciliary of Missouri.  At all times relevant to this Complaint, Johnson is and was a member of a protected class of individuals recognized under 42 U.S.C. § 2000e-2(a)(1), which prohibits discrimination based on race and/or sex (African American, African American, Native American, Caucasian, and Puerto Rican, female).

4.      RH Cherry Creek, LLC d/b/a Sonic Drive-In is a limited liability company with a principal office located at 10515 E. 40th Avenue, Suite 101, Denver, Colorado 80239.  At all relevant times, Defendant was an employer within the meaning of Title VII, Section 1981, and CADA.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and (a)(4).  The Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367, as such claims arise out of the same case or controversy as Plaintiffs' Title VII and Section 1981 claims.

6.    Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in Colorado.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

7.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully and separately stated herein.

8.    Ms. Douglas filed her Charge of Discrimination, Number 541-2019-01458, with the U.S. Equal Employment Opportunity Commission ("EEOC"), for race and sex discrimination and retaliation on or about April 1, 2019, and filed an Amended Charge on or about April 4, 2019. Ms. Douglas was issued a Right to Sue determination from the EEOC on November 13, 2020.

9.    Ms. Johnson filed her Charge of Discrimination, Number 541-2019-00770, with the U.S. Equal Employment Opportunity Commission ("EEOC"), for race and sex discrimination and retaliation on February 11, 2019, and filed an Amended Charge on or about June 18, 2019. Ms. Johnson was issued a Right to Sue determination from the EEOC on November 13, 2020.

10.    The Complaint in this matter was timely filed within 90 days of receipt of Ms. Douglas' Notice of Right to Sue.

11.    The Complaint in this matter was timely filed within 90 days of receipt of Ms. Johnson's Notice of Right to Sue.

12.    Plaintiffs have met all administrative prerequisites prior to filing this action.

## GENERAL ALLEGATIONS

13.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully and separately stated herein.

14.     Hailey Douglas, an African American woman, worked for Defendant from on or around September 3, 2018 to January 22, 2019.

15.     Morgan Johnson, an African American, Native American, Caucasian, and Puerto Rican woman, worked for Defendant from on or around June 28, 2018 to December 18, 2018.

16.     Plaintiffs worked at Defendant's restaurant located at 7739 E. Iliff Avenue in Denver, Colorado 80231.

17.     Upon information and belief, Defendant employs – at any given time – between 400 and 750 employees.

18.     Upon information and belief, Defendant operates approximately 28 locations in or around the Denver-metro area.

19.     Plaintiffs were subjected to harassment, a hostile work environment, and were retaliated against for reporting the discriminatory conduct.

20.     On or around November 1, 2018, Henry Coronado (Hispanic, male) became Defendant's Assistant General Manager.

21.     Once Mr. Coronado took charge, it became clear that policies and practices would be different under his reign – women and African American employees would be frequently disrespected and held to higher standards and expectations than other, Caucasian/Hispanic and male employees.

**Douglas Factual Allegations**

22.     On or around November 1, 2018, Mr. Coronado became Ms. Douglas' direct supervisor.

23.     On or around November 25, 2018, Mr. Coronado instructed Ms. Douglas to severely reduce the hours that John Collins (African American, male) was scheduled to work, claiming that Mr. Collins "is a problem for me" because he "knows too much."

24.     Ms. Douglas later learned that Mr. Coronado considered Mr. Collins to be "a problem" because Mr. Collins was aware that Mr. Coronado was actively attempting to engage in sexual relationships with Defendant's young, female employees.

25.     On or about December 1, 2018, Mr. Coronado gave raises to numerous female employees.  The females he gave raises to were less experienced than Ms. Douglas; however, Ms. Douglas later learned that those he gave raises to were listed in the "sex pact."

26.     On or around December 17, 2018, Defendant hosted its annual holiday party.

27.     At the holiday party, Mr. Coronado, Jonathan Gonzalez (Manager), and Angel Guerrera (Crew Leader) made a "sex pact," i.e. the three male employees agreed to see which of them could engage in sexual relationships with their 15 to 21-year-old female coworkers.

28.     Mr. Guerrera – one of the men involved in the sex pact conversation – told Ms. Douglas about it after the conversation.

29.     When Mr. Guerrera told Ms. Douglas about it, she looked shocked.  He responded: "If a man finds out that a 15-year-old is willing to give it up, then something is wrong with the man if he's not willing to take it."

30.     Ms. Douglas was appalled at what was happening and, in particular, that Mr. Coronado as a manager was attempting to prey on his young female employees.

31.     Around the same time as she learned about the sex pact, Jocelyn Chavez (a then 15-year-old employee) informed Ms. Douglas that she was receiving late night text messages from

Mr. Coronado.  Ms. Chavez reported that Mr. Coronado had texted her, late at night, to ask whether she had finished her homework, whether she had a boyfriend, and saying that he would send her nude photographs of himself if he was more inebriated.

32.    On or about December 18, 2018, Mr. Douglas confronted Mr. Coronado about his inappropriate sexual harassment of Defendant's female employees.

33.    **Shortly after Ms. Douglas confronted Mr. Coronado, he began to treat her differently.**

34.    In December 2018, Mr. Coronado reduced Ms. Douglas' shifts, began nitpicking her work, and berating her.

35.    On or about December 23, 2018, Mr. Coronado verbally reprimanded Ms. Douglas, claiming that she left Defendant's store in a "bad condition" after her shift because she had forgotten to take out the trash prior to leaving.  This type of conduct occurred frequently, and Managers were usually not scolded for it.

36.    However, regarding this occasion – shortly after Ms. Douglas confronted Mr. Coronado about flirting with young female supervisees – Mr. Coronado wrote a spurious write-up on December 27, 2018.  Ms. Douglas first learned about this alleged write-up post-termination.

37.    On or about December 27, 2018, Mr. Coronado wrote a Corrective Action Plan regarding the December 23, 2018 incident.  In the Corrective Action Plan, Mr. Coronado claimed that Ms. Douglas had agreed to have her shifts reduced to three shifts per week.  Contrary to what is stated in the Corrective Action Plan, Ms. Douglas did not have a conversation with Mr. Coronado about reducing her hours.

38.     On or about December 28, 2019, Ms. Douglas told Ryan Irvine (District Manager, Caucasian/Hispanic) that – if her hours were cut in retaliation for reporting harassment – then she intended to file a Charge of Discrimination with the EEOC.

39.     On or about December 30, 2018, for example, Mr. Coronado yelled at Ms. Douglas: "You don't know how to work!  You need to learn how to work!  If I make a mess, it's your job to clean it up!  Because I'm your fucking boss!"

40.     Following the December 30, 2018 incident, Ms. Douglas called Ryan Irvine (District Manager, Caucasian/Hispanic) to report Mr. Coronado's conduct.

41.     On or about January 2, 2019, Mr. Coronado, Mr. Irvine, and Ms. Douglas met to discuss Ms. Douglas' reported concerns.

42.     Instead of helping address the issues Ms. Douglas had reported, Mr. Irvine informed Ms. Douglas that Morgan Johnson (female, African American) had filed a Charge of Discrimination with the EEOC and insisted that Ms. Douglas *must* provide a statement *against* Ms. Johnson.  Mr. Irvine implied that if Ms. Douglas did not provide a statement as requested, then she would be terminated.

43.     Ms. Douglas explained to Mr. Irvine that she was not working on the date of the incident they wanted her to write a statement about – i.e. the December 17, 2018 incident between Ms. Johnson and Ms. Coronado – and that she had not witnessed the incident.

44.     Again, they insisted that Ms. Douglas write a statement.

45.     Ms. Douglas wrote a statement explaining that she had not been at the Defendant's store that day and did not witness what occurred between Jessica Coronado and Ms. Johnson.

46.     Oddly, Mr. Irvine tore apart the statement Ms. Douglas had written and insisted that she write another one.

47.     Ultimately, Ms. Douglas wrote a second statement explaining – as instructed by Mr. Coronado – that Ms. Johnson had agreed to cover her shift.  However, Ms. Douglas added that she was not present during the incident between Ms. Johnson and Jessica Coronado (female, Hispanic).

48.     Upon information and belief, other employees were likewise forced by Mr. Irvine and/or Mr. Coronado to write statements for the EEOC.

49.     Mr. Irvine's failure to address her reported concerns about Mr. Coronado's sexual harassment of Defendant's employees – and his insistence that Ms. Douglas write a statement about Ms. Johnson – further concerned Ms. Douglas.

50.     On or about January 2, 2019, Ms. Douglas called Dora Simonds (Director of Operations) to report the discrimination and retaliation, along with Defendant's attempt to interfere with the EEOC's investigation by forcing employees to write statements.

51.     On or about January 9, 2019, Ms. Douglas was issued another spurious write-up, purportedly for locking a bathroom.  Ms. Douglas first learned about this alleged write-up post-termination.

52.     On or about January 17, 2019, Mr. Coronado called Ms. Douglas and asked her to cover his shift for him, claiming that he was too inebriated to go into work.  Ms. Douglas covered Mr. Coronado's shift as requested.

53.     On or about January 21, 2019, Mr. Coronado informed Ms. Douglas that he had put in a request to transfer her to a different store.  Likewise, Ms. Douglas learned that January 22, 2019 was the last day that Defendant had included her on the work schedule.

54.     Beginning on or about January 22, 2019, Defendant had completely removed Ms. Douglas from the work schedule in an act of retaliation.

55.     On or about January 22, 2019, Ms. Douglas contacted Mr. Irvine to ask which store she was going to be transferred to.  Mr. Irvine informed her that Mr. Coronado had not put in a transfer request.

56.     On or about January 22, 2019, Ms. Douglas called Ms. Simonds to report that Mr. Coronado had discriminated against her based on her sex and/or race and had retaliated against her for reporting that he was sexually harassing Defendant's young employees.  Ms. Simonds responded that all she had time to worry about was the business she was running.

57.     On or about January 22, 2019, Ms. Douglas asked Mr. Coronado if she could leave early – around 9:30 pm – due to a daycare problem.  Mr. Coronado said yes.

58.     To confirm, and knowing that Mr. Coronado was upset with her about confronting him for flirting with young supervisees, Ms. Douglas sent a text message to Mr. Irvine stating: "Henry authorized me to leave early due to the babysitter issue… Just letting you know so tomorrow he['s] not saying I just walked out…"

59.     On or about January 23, 2019, Mr. Coronado executed another Corrective Action Plan, alleging that on January 22, 2019, Ms. Douglas left her shift early without permission.  Again, Ms. Douglas did not learn of the Corrective Action Plan until after her termination.

60.     Between January 24 and 26, 2019, Ms. Douglas called Mr. Coronado to ask about when she was next scheduled.  At this time, Mr. Coronado said: "You are not going to be on the schedule for the next week because of the transfer."

61.     According to the Defendant, Ms. Douglas was terminated on or about January 25, 2019.

62.     In or around early February 2019, Ms. Douglas learned that she was terminated from a then-manager (Jesse Adams, Caucasian/Hispanic) who had been assigned her shifts.

63.     Thus, Ms. Douglas was terminated in retaliation for reporting sexual harassment and/or because of her race.

64.     On or about February 2019, Ms. Simonds called Ms. Douglas to reiterate that she was terminated and to inform her that she could try to file for unemployment benefits.

65.     On information and belief, upon termination, Ms. Douglas was replaced by Jesse Adams (Hispanic/Caucasian).

**Johnson Factual Allegations**

66.     Ms. Johnson began working for Defendant on or about June 28, 2018.

67.     In or around July 2018, Mr. Edwards told Ms. Johnson that she was promoted to Assistant Manager.  However, he failed to appropriately document her promotion in the Defendant's computer system.

68.     On or about August 28, 2018, Ms. Johnson was physically assaulted in the Defendant's parking lot by Mary (last name unknown, Hispanic, Store Manager).

69.     Ms. Johnson promptly reported the assault to Mr. Irvine, who reported it to Dora Simonds (Director of Operations).

70.     To Ms. Johnson's knowledge, nothing was done to investigate the matter or to reprimand Mary.

71.     On or about November 1, 2018, Mr. Coronado (Hispanic) replaced Duvolus Edwards (African American) as Assistant General Manager.

72.     Shortly after Mr. Coronado took charge, he began flirting with his young female employees, with whom he hoped to engage in sexual relationships.

73.     On or about November 13, 2018, Mr. Coronado put Ms. Johnson into the Defendant's computer system as an Assistant Manager, as Mr. Edwards had already promoted her to Assistant Manager but had failed to appropriately document the promotion.

74.     However, shortly after, in November 2018, while Ms. Johnson was on a pre-approved vacation, Mr. Coronado promoted Julia Moreno (Hispanic) to the position of Assistant Manager.   While Ms. Johnson was away, Mr. Coronado informed Ms. Douglas that he was demoting Ms. Johnson so that he could fill the position with Ms. Moreno.  Ms. Douglas exclaimed that she thought it was inappropriate to demote Ms. Johnson – she had done nothing wrong.

   a.  Upon information and belief, Mr. Coronado promoted Ms. Moreno to the position of Assistant Manager so could have better access to try to flirt with his young supervisee.

   b.  However, shortly after Ms. Johnson returned from vacation, he allowed Ms. Johnson to remain in her role as an Assistant Manager and instead transitioned Ms. Moreno to a position as "Drink Manager."

   c.  Upon information and belief, shortly after promoting Ms. Moreno to Drink Manager, Mr. Coronado began to flirt with Ms. Moreno's younger sister, America Moreno (Hispanic), who was then 15 years old.

    d.   However, Mr. Coronado's infatuation with Julia Moreno soon seemed to end.

    e.   In or around November or December 2018, Mr. Coronado instructed Ms. Douglas to reduce Julia Moreno's hours to approximately one to two days a week, so that Julia Moreno would feel forced to resign.

75.    On or about November 16, 2018, Ms. Johnson witnessed a customer yelling at a coworker, Delray Davis (African American), and calling Mr. Davis a "nigger."

76.    Ms. Johnson reported the incident to Mr. Coronado, and her concerns that it was racially motivated.

77.    Instead of heeding Ms. Johnson's concerns, Mr. Coronado informed Ms. Johnson that Mr. Davis had "picked a fight" with a customer and "needed to be fired."

78.    Despite the fact that Ms. Johnson was one of the only witnesses to the incident, the Defendant did not interview her or take a statement from her about the incident.

79.    On or about November 17, 2018, Mr. Coronado asked to speak to Ms. Johnson because the customer who had called Mr. Davis a "nigger" had, allegedly, left a negative review about Defendant.

80.    When Ms. Johnson spoke with Mr. Coronado, he instructed her to fire Mr. Davis. Following this incident, Ms. Johnson spoke with Mr. Davis about Mr. Coronado's instruction to terminate him.  When she did, Mr. Davis said: "Don't worry about it, I quit."

81.    On or about November 28, 2018, Mr. Coronado sent Ms. Johnson a string of text messages between 3:41 a.m. and 4:22 a.m., including "Something went wrong, fix it pls;" "Idk,u got my green light.terminate;" "Just do ur law,fire anyone;" and "I'll back you up."

82.     On or about December 6, 2018, Ms. Johnson instructed Silvino Chavez Moreno (Hispanic) to take a break, as she had been instructed to do by Mr. Coronado.  Mr. Moreno refused.  Again, Ms. Johnson instructed Mr. Moreno to take the requisite break.  In response, Mr. Moreno cursed at Ms. Johnson, then stormed out of the store and did not return to work for the day.

83.     Because Mr. Moreno did not return to work that day, Ms. Johnson reported his conduct to Mr. Coronado and asked whether Mr. Moreno should be terminated or reprimanded.  Mr. Coronado insisted that Mr. Moreno would not be terminated.

84.     Upon information and belief, Mr. Moreno was not reprimanded or disciplined for leaving early without permission.

85.     On or about December 10, 2018, Ms. Johnson received a string of strange text messages from Mr. Coronado, during nonworking hours, and in which he seemed intoxicated.  The following are a string of erratic text messages Mr. Coronado sent Ms. Johnson between 10:42 p.m. and 11:18 p.m. on or about December 10, 2018:

(a) Johnson: So did you get it??  [By this, Ms. Johnson was asking about the amount a carhop was expected to deliver to the safe].

(b) Coronado: Not yet Morgan my best mgr,I still got plans for u,just wait and change the culture

(c) Coronado: I'm sorry if I'm failing u,

(d) Coronado: Hey 385

(e) Johnson: Your not failing me you just have me thinking you don't want me to work for you.

(f) Coronado: I do Morgan,I'm just doing changes to see who the problem is,I miss u Morgan,don't give up,I won't yet

(g) Coronado: But I got to show ya who the problem is

(h) Coronado: That's what I want u to see,IM THE FUCKING BOSS

(i) Johnson:  ??? I know. ?? Okay

(j) Coronado: Remember the store is not running how I want 2guest what?me that's WHOOOOO

(k) Coronado: Hey I'm sorry

86.     On or about December 13, 2018, Ms. Johnson told Mr. Coronado that she did not like how he was treating her.  By this, she meant that he was harassing her and treating her differently than other employees because of her race and/or gender.

87.     **<u>Shortly after standing up to Mr. Coronado for harassing her, Mr. Coronado began to treat Ms. Johnson differently.</u>**

88.     Mr. Coronado's treatment of Ms. Johnson steadily worsened following her report. For example, Mr. Coronado walked away when Ms. Johnson was speaking to him; Mr. Coronado sent Ms. Johnson home from work early more frequently; and Mr. Coronado was less responsive than usual to Ms. Johnson's text messages.

89.     On or about December 17, 2018, Ms. Johnson agreed to cover a shift for her coworker, Ms. Douglas.

90.     During the December 17, 2018 shift, Ms. Johnson took food temperatures for the Assistant Manager on-duty, Jonathan Gonzalez (Hispanic).  When she finished taking the temperatures, she placed the logbook near Mr. Gonzalez.

91.     Jessica Coronado (Hispanic, and the sister of Assistant General Manager, Henry Coronado) frequently seemed to be angry with Ms. Johnson and, in this instance, Ms. Coronado was upset with where Ms. Johnson had placed the logbook.

92.     Ms. Coronado yelled at Ms. Johnson, called her "stupid" and threw the logbook at her.

93.     Ms. Johnson walked into the bathroom and took a few moments to clear her head after Ms. Coronado's outburst.  When Ms. Johnson returned from the bathroom, Ms. Coronado continued to yell at her.

94.     At approximately 2:31 p.m. on December 17, 2018, Ms. Johnson sent a text message to Mr. Coronado asking when he was arriving so that she could leave.

95.     To escape further abuse, Ms. Johnson asked Mr. Gonzalez – who was then Ms. Johnson's supervisor – if she could leave early.  Mr. Gonzalez consented, and Ms. Johnson left early.

96.     Later that same day, December 17, 2018, Ms. Johnson went to the Defendant's annual holiday party.  Ms. Johnson noticed at the party that employees seemed to largely avoid speaking to her and her husband.  She later learned that the awkward tone at the holiday party was related to a "sex pact" that Mr. Coronado and others had agreed to at the holiday party.

97.     Ms. Johnson later learned that, at the holiday party, Mr. Coronado, Mr. Gonzalez, and Angel Guerrera (Crew Leader, Hispanic) made a "sex pact," i.e. the three male employees agreed to compete to see who could engage in sexual relationships with their 15 to 21-year-old female coworkers.

98.     In the "sex pact," Mr. Coronado, Mr. Gonzalez, and Mr. Guerrera agreed to try to have sexual intercourse with the following employees:

(a)  America Moreno (then approximately 15 years old);

(b)  Jocelyn Chavez (then approximately 17 years old);

(c)  Janessa Robinson (then approximately 15 years old);

(d)  Julia Moreno (then approximately 19 years old); and

(e)  Morgan Johnson (then 21 years old).

99.     Soon after Mr. Coronado sexualized Ms. Johnson by including her in the "sex pact" list, he decided to terminate her.

100.    On December 18, 2018, Mr. Coronado started a rumor that Ms. Johnson had walked out of her shift without permission the prior day.

101.    In the morning on December 18, 2018, Mr. Coronado informed Ms. Johnson that she was terminated, allegedly for walking out of her shift early without a manager's permission.

102.    On December 18, 2018, Ms. Johnson and Mr. Gonzalez had the following text message conversation, clarifying that Mr. Gonzalez had given Ms. Johnson permission to leave:

a.   Johnson: Be honest with me, I won't get mad.  I just wanna know if you really said I walked out on your shift?

b.   Gonzalez: All I said was that you told me you was leaving and I said ok[.]

103.    On information and belief, upon termination, Ms. Johnson was replaced by Julia Moreno (Hispanic).

104.    Jesse Adams (Caucasian) specifically informed Ms. Douglas that he and Jonathan Gonzalez (Hispanic) were hired to replace Ms. Douglas and Mr. Johnson.

105.    Following her termination, Ms. Johnson again tried to report the unlawful treatment and termination to Ms. Simonds.  Ms. Simonds responded by saying that she did not have time to deal with it, was only now investigating because of the unemployment claim, and blamed Ms. Johnson for the reported incident with Mary.  Excerpts of what Ms. Simonds stated are as follows:

(a) "I run a company; I don't have any of time for this nonsense."

(b) "The only reason why I'm investigating now is because I have an unemployment claim from your side."

(c) "I cannot stop you from having a fight with Mary in the middle of my parking lot. . . . I cannot stop anybody from doing anything they want."

(d) "It is the way it is."

**Additional Factual Allegations**

106.    Numerous African American employees were terminated or forced to resign from working for Defendant and were replaced with less-experienced Hispanic employees.  For example: John Collins, Delray Davis, and Monica (last name unknown) (all African American employees) were terminated or forced to resign, and were replaced by Jesse Adams, Jonathan Gonzalez, Jocelyn Chavez, Silvino Chavez Moreno, Patricia (last name unknown), and Jessica Coronado (all Caucasian and/or Hispanic employees).

107.    Policies and rules were not applied equally to African American and Hispanic employees.  The following are a few, but not an inclusive list of, examples:

(a) Hispanic and/or Caucasian employees were allowed to have free ice cream, while African American employees were denied same.

(b) Ms. Johnson was allegedly terminated for walking out on a shift, even though she received permission from her Manager on duty prior to leaving early.  On the other hand, Silvino Chavez Moreno (male, Hispanic) left a shift early, and without permission, a few weeks prior to Ms. Johnson's termination.  When Mr. Moreno left his shift early, Ms. Johnson was the Assistant Manager on duty.  Thus, she issued him a write-up for leaving a shift early without permission.  When Ms. Johnson informed Mr. Coronado, Mr. Coronado tore up Mr. Moreno's write-up.  Thus, despite leaving his shift early, and without permission, Mr. Moreno was not reprimanded.

108.    Upon information and belief, John Collins (African American) witnessed the following:

(a) On numerous occasions, Mr. Coronado, Jonathan Gonzalez, and Jesse Adams mocked Mr. Collins for having dreadlocks.  They made comments such as: "Your hair is dirty;" "It looks like worms;" and "Your hair is so unprofessional."

(b) Mr. Coronado yelled at Mr. Collins for using a large cup for his free shift drinks, insisting that he use a small cup.  However, Matthew Crud (Caucasian) used a large cup for free shift drinks and, despite Mr. Coronado witnessing this, Mr. Crud was not scolded.

(c) On numerous occasions, Mr. Collins witnessed Mr. Coronado behaving inappropriately with Morgan Johnson.  For example, when Ms. Johnson was doing work on the computer, Mr. Coronado would stand behind her, inappropriately close and peering over her shoulder.  Mr. Coronado's flirtation with Ms. Johnson was so obvious that coworkers made jokes about it.

(d)  Towards the end of Ms. Johnson's employment, Mr. Collins witnessed Mr. Coronado's conduct towards Ms. Johnson change from flirtatious to easily angered.

(e)  Mr. Collins witnessed Mr. Coronado treat Hailey Douglas with obvious disdain.  For example, when Victor (last name unknown, Hispanic) threatened to walk off of a shift, Ms. Douglas told Victor that if he left, he could not comeback.  The following day, Mr. Coronado scolded Ms. Douglas for this, despite the fact that it was within her job duties as a Store Manager to terminate employees.  On another occasion, Mr. Collins witnessed Mr. Coronado angrily crossing Ms. Douglas' name off of the schedule.

(f)  On or about December 21, 2018, Mr. Coronado loudly berated Mr. Collins for allegedly making a drink incorrectly.  Mr. Collins responded that he did not like how Mr. Coronado was treating him.  In response, Mr. Coronado stated: "That's why you don't hire black people."

(g)  On numerous occasions, Mr. Collins told Ryan Irvine and Dora Simonds that he was being discriminated against based on race.  His reports were largely ignored.  Instead, Ms. Simonds stated to Mr. Collins: "If you don't want to work here, then quit.  It's Henry's store and he's going to run it how he wants to run it.  If you don't want to be here then don't."

## FIRST CLAIM FOR RELIEF
**Discrimination and Harassment Based on Race and/or Sex in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII")**

109.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully and separately stated herein.

110.    Plaintiffs are "employees" as defined in 42 U.S.C. § 2000e(f).

111.    Defendant is an "employer" as defined in 42 U.S.C. §§ 2000e(b).

112.    Title VII prohibits discrimination based on race and/or sex in employment.

113.    Based on the above-described acts, practices, and omissions, Defendant engaged in unlawful discrimination under Title VII based on Plaintiffs' race and/or sex.

114.    Defendant's harassment of Plaintiffs was aimed at Plaintiffs because of their race and/or sex, resulting in adverse impacts to the terms and conditions of Plaintiffs' employment and further subjecting Plaintiffs to harassment and a hostile work environment.

115.    Defendant's conduct was sufficiently severe or pervasive that a reasonable person in Plaintiffs' positions would find Plaintiffs' work environments to be hostile or abusive.

116.    At the time the above-described conduct occurred and as a result of such conduct, Plaintiffs believed their work environment to be hostile or abusive.

117.    Defendant knew or should have known of the abusive conduct and failed to take prompt, remedial action to stop its conduct.

118.    As such, Defendant violated 42 U.S.C. § 2000e-2(a) and discriminated against Plaintiffs by not only subjecting them to sufficiently severe or pervasive harassment based on their race and/or sex so as to alter the conditions and terms of Plaintiffs' employment, but also by failing to act and condoning or tolerating such harassment, subjecting Plaintiffs to less favorable terms and conditions of employment by imposing heightened and/or disproportionate expectations and demands on Plaintiffs.

119.    The reasons that Defendant submits for changing the terms and conditions of Plaintiffs' employment and terminating them, if any, are false and pretext for unlawful discrimination.

120.    In unlawfully discriminating and retaliating against Plaintiffs, Defendant acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Plaintiffs' equal rights under law, thereby necessitating the imposition of exemplary damages.

121.    As a result of Defendant's above-described conduct, Plaintiffs have suffered loss of income, emotional pain and suffering, embarrassment, and inconvenience, and they are entitled to general and special damages, and economic damages including front and back pay.  Plaintiffs are also entitled to and seek their attorneys' fees and costs as permitted by law.

### SECOND CLAIM FOR RELIEF
### Retaliation in Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*

122.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully and separately stated herein.

123.    Plaintiffs engaged in activity protected by Title VII including, but not limited to, the following examples: when Ms. Johnson reported the racially-motivated customer conduct to Mr. Coronado; when Ms. Johnson reported that she did not like how Mr. Coronado was treating her when he sent erratic and abusive texts throughout the night; when Ms. Johnson reported Ms. Coronado's assault; when Ms. Douglas confronted Mr. Coronado about sexually harassing his subordinates; and when Ms. Douglas reported Mr. Coronado's discriminatory and unlawful conduct to Ryan Irvine and Dora Simonds.

124.    Defendant subjected Plaintiffs to less favorable terms, conditions, and privileges of employment because they reported race and/or sex-based harassment to Defendant.

125.    Plaintiffs' opposition and complaints regarding Defendant's illegal practices were protected activities within the meaning of Title VII.

126.     Defendant unlawfully retaliated against Plaintiffs in the terms and conditions of their employment and subjected Plaintiffs to further harassment because they engaged in the above-described statutorily-protected activities.  For example, Defendant, among other things, subjected Plaintiffs to altered terms and conditions of employment when Defendant reduced Ms. Douglas' hours following her reports of discrimination.  Likewise, Defendant unlawfully retaliated against Plaintiffs by terminating them because they engaged in statutorily-protected activities.

127.     A causal connection exists between Plaintiffs' protected activities and Defendant's unlawful retaliation.

128.     In unlawfully discriminating and retaliating against Plaintiffs, Defendant acted willfully, wantonly, and/or with malice or with the conscious and/or reckless indifference to Plaintiffs' equal rights under law, thereby necessitating the imposition of exemplary damages.

129.     As a result of Defendant's retaliatory conduct, Plaintiffs have suffered loss of income, emotional pain and suffering, embarrassment and inconvenience, and they are entitled to general and special damages, and economic damages including front and back pay.  Plaintiffs are also entitled to and seek their attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

## THIRD CLAIM FOR RELIEF
**Discrimination and Harassment Based on Race, Ancestry, Ethnicity, Ethnic Traits, and/or National Origin in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981")**

130.     Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully and separately stated herein.

131.     Section 1981 prohibits discrimination in the making and enforcement of contracts and is designed to include a remedy against discrimination in employment on the basis of race, ancestry, ethnicity, ethnic traits, and/or national origin.

132.    Under Section 1981, all persons have the same right to make and enforce contracts and to enjoy full and equal benefit of all laws.

133.    Employment contracts are among those contracts protected by Section 1981.

134.    Defendant entered into contracts with Plaintiffs that are subject to Section 1981.

135.    Plaintiffs were treated differently by Defendant than similarly-situated employees who did not have Plaintiffs' race, ancestry, ethnicity, ethnic traits, and/or national origin.

136.    Plaintiffs were denied full and equal benefit of all laws based on their race, ancestry, ethnicity, ethnic traits, and/or national origin unlike similarly situated employees who did not have Plaintiffs' race, ancestry, ethnicity, ethnic traits, and/or national origin.

137.    Based on the above-described acts, practices, and omissions, Defendant engaged in unlawful discrimination under Section 1981 based on Plaintiffs' race, ancestry, ethnicity, ethnic traits, and/or national origin.

138.    Defendant's harassment of Plaintiffs was aimed at Plaintiffs because of their race, ancestry, ethnicity, ethnic traits, and/or national origin, resulting in adverse impacts to the terms and conditions of Plaintiffs' employment and further subjecting Plaintiffs to harassment and a hostile work environment.

139.    At the time the above-described conduct occurred and as a result of such conduct, Plaintiffs believed their work environment to be hostile or abusive.

140.    Defendant knew or should have known of the abusive conduct and failed to take prompt, remedial action to stop its conduct.

141.    As such, Defendant violated 42 U.S.C. § 1981 and discriminated against Plaintiffs by denying them full and equal benefit of all laws, subjecting them to sufficiently severe or

pervasive harassment based on their race, ancestry, ethnicity, ethnic traits, and/or national origin so as to alter the conditions and terms of Plaintiffs' employment, and by failing to act and condoning or tolerating such harassment, subjecting Plaintiffs to less favorable terms and conditions of employment by imposing heightened and/or disproportionate expectations and demands on Plaintiffs, and ultimately terminating Plaintiffs.

142.    The reasons that Defendant submits for changing the terms and conditions of Plaintiffs' employment and terminating them, if any, are false and pretext for unlawful discrimination.

143.    In unlawfully discriminating and retaliating against Plaintiffs, Defendant acted intentionally or in face of a perceived risk that its decisions would violate federal law, thereby necessitating the imposition of punitive damages.

144.    As a result of Defendant's above-described conduct, Plaintiffs have suffered loss of income, emotional pain and suffering, embarrassment and inconvenience, and they are entitled to general and special damages, and economic damages including front and back pay.  Plaintiffs are also entitled to and seek their attorneys' fees and costs (including expert witness costs) pursuant to 42 U.S.C. § 1988(b) and (c).

## FOURTH CLAIM FOR RELIEF
### Retaliation in Violation of Section 1981

145.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully and separately stated herein.

146.    Plaintiffs engaged in activity protected by Section 1981 when they reported Defendant's unlawful and discriminatory practices.

147.     Defendant subjected Plaintiffs to less favorable terms, conditions, and privileges of employment – and terminated Plaintiffs – because they reported race, ancestry, ethnicity, ethnic traits, and/or national origin-based harassment to Defendant.

148.     Plaintiffs' opposition and complaints regarding Defendant's illegal practices were protected activities within the meaning of Section 1981.

149.     Defendant unlawfully retaliated against Plaintiffs in the terms and conditions of their employment and subjected Plaintiffs to further harassment because they engaged in the above-described statutorily-protected activities.  For example, Defendant, among other things, subjected Plaintiffs to altered terms and conditions of employment when Defendant reduced Ms. Douglas' hours after she reported the discrimination and when Defendant terminated Plaintiffs. Defendant further failed and refused to take corrective action that would prevent Plaintiffs from being subjected to further harassment, and instead terminated Plaintiffs.

150.     A causal connection exists between Plaintiffs' protected activities and Defendant's unlawful retaliation.

151.     In unlawfully discriminating and retaliating against Plaintiffs, Defendant acted intentionally or in face of a perceived risk that its decisions would violate federal law, thereby necessitating the imposition of punitive damages.

152.     As a result of Defendant's retaliatory conduct, Plaintiffs have suffered loss of income, emotional pain and suffering, embarrassment and inconvenience, and they are entitled to general and special damages, and economic damages including front and back pay.  Plaintiffs are also entitled to and seeks their attorneys' fees and costs (including expert witness costs) pursuant to 42 U.S.C. § 1988(b) and (c).

**FIFTH CLAIM FOR RELIEF**

**Discrimination Based on Race and/or Sex in Violation of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-301, *et seq.* ("CADA")**

153.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully and separately stated herein.

154.    Defendant subjected Plaintiffs to less favorable terms and conditions of their employment based on their race and/or sex, including but not limited to, by: subjecting them to sufficiently severe or pervasive harassment based on their race and/or sex so as to alter the conditions and terms of their employment; condoning or tolerating such harassment and failing to act to protect Plaintiffs after they reported the same; retaliating against Plaintiffs and subjecting them to less favorable terms and conditions of employment by reducing their work hours, and terminating Plaintiffs.

155.    Plaintiffs registered numerous complaints regarding the race and/or sex harassment and the hostile work environment with their supervisors.  Plaintiffs were retaliated against for reporting the issues.

156.    Defendant's above-described conduct constituted discrimination based on Plaintiffs' race and/or sex in violation of CADA.

157.    In unlawfully discriminating and retaliating against Plaintiffs, Defendant acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Plaintiffs' equal rights under law, thereby necessitating the imposition of exemplary damages.

158.    As a direct and proximate result of Defendant's actions, Plaintiffs have suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and

inconvenience and they are entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees as permitted by law.

### SIXTH CLAIM FOR RELIEF
**Retaliation in Violation of CADA**

159.    Plaintiffs incorporate by reference all paragraphs of this Complaint as though fully and separately stated herein.

160.    Plaintiffs participated in statutorily protected activity by opposing unlawful practices under CADA, including discrimination and harassment based on Plaintiffs' race and/or sex.

161.    As a result of Plaintiffs' protected opposition to discrimination and harassment, Defendant retaliated against them by subjecting them to less favorable terms and conditions of employment as described in this Complaint.

162.    In unlawfully discriminating and retaliating against Plaintiffs, Defendant acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Plaintiffs' equal rights under law, thereby necessitating the imposition of exemplary damages.

163.    As a direct and proximate cause of Defendant's above-described conduct, Plaintiffs have suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience, and they are entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against Defendant and order the following relief as allowed by law:

A.      Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

B.      Back pay and benefits;

C.      Front pay and benefits;

D.      Punitive damages and exemplary damages, as permitted by law;

E.      Attorneys' fees and costs of this action (including expert witness fees), as permitted by law;

F.      Pre-judgment and post-judgment interest at the highest lawful rate; and

G.      Such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs respectfully request a trial by jury on all issues so triable.

Respectfully submitted this 11th day of February 2021.


                     **HKM EMPLOYMENT ATTORNEYS LLP**


                     By: *s/ Jesse K. Fishman*
                         Jesse K. Fishman (44807)
                         Claire E. Hunter (39504)
                         HKM Employment Attorneys LLP
                         730 17th Street, Suite 750
                         Denver, Colorado 80202
                         Telephone: (720) 668-8989
                         jfishman@hkm.com
                         chunter@hkm.com
                         *Attorneys for Plaintiffs Hailey Douglas*
                         *and Morgan Johnson*